Andrias, J.
(dissenting). Almost 40 years ago, over a two year period, petitioner participated in crimes which led to his conviction on felony drug and burglary charges. Petitioner now seeks an order pursuant to Rules of the Appellate Division, First Department (22 NYCRR) § 602.1 granting his third application for admission to practice notwithstanding the adverse decision of the Committee on Character and Fitness (Committee). Although the subcommittee convened by the Committee to conduct a hearing as to petitioner’s fitness unanimously recommended that the application be granted, the Committee, by a 16-to-12 vote, with one abstention, voted to disapprove the subcommittee’s recommendation.
The majority acknowledges that petitioner, now 66, has led a stable, respectable, productive and law abiding life since he was released on parole more than 32 years ago, has expressed genu *82 inc remorse for his crimes, is respected in the Brooklyn legal community where he works as a paralegal, and is not likely to re-offend. Two character witnesses, persons of achievement with significant professional credentials who placed their own reputations on the line by vouching for petitioner’s integrity, attested to petitioner’s sterling reputation for truth and honesty. Nevertheless, dwelling on petitioner’s conduct with respect to his prior applications for admission, the last of which was filed more than 20 years ago, and straining to distinguish this matter from this Court’s recent decision in Matter of Wiesner (94 AD3d 167 [1st Dept 2012]), the majority discards this evidence and finds that petitioner should once again be denied admission because, in the view of the majority, his post-conviction life has not been so exemplary as to make amends for his past crimes, for which petitioner continues to attempt to minimize his culpability.
I do not agree. Stripped of hyperbole and rhetoric, the majority is denying petitioner’s application based on its belief that he has not been adequately punished for his past crimes, which include his participation in a burglary in which an elderly woman suffocated after she was gagged. However, that is not the test we applied in Wiesner, which focuses solely on whether the applicant currently possesses the character and fitness to practice law. Applying that test, although the nature and character of the crimes committed by petitioner raise serious concerns, petitioner’s consistent behavioral pattern of responsibility and societal contributions over the past 32 years, and his admissions in his current application and before the subcommittee that he is responsible for his past criminal acts and for his lack of candor in his prior applications, clearly and convincingly demonstrate that petitioner’s personal reform and rehabilitation are genuine and complete. Accordingly, because petitioner currently possesses the requisite character and fitness for admission to the bar, I dissent and would grant the application.
Between 1965 and 1967, petitioner attended Howard University. Between 1968 and 1970, he worked for the Post Office and the D.C. Transit Company. After attending Ohio State University for a year, between 1971 and September 1973 petitioner worked as a bus driver and then for an insurance company.
Petitioner’s downward spiral into a life of crime occurred over the next two years, after the insurance company relocated and his employment ended. In November 1973, petitioner was ar *83 rested and charged with forgery in the third degree and criminal simulation based on possession of counterfeit perfume. The charges were dismissed. Between 1973 and 1975, he was employed as a manager and assistant manager of massage parlors in New York and Rhode Island which served as fronts for a prostitution operation. In 1974, he allegedly interfered with a search at one of the parlors and was charged with obstructing a police officer. The charge was dismissed and all records related thereto sealed.
In March 1975, petitioner was indicted for multiple counts of sale of a controlled substance, but was released from custody so he could act as a confidential informant for the New York City Police Department’s Organized Crime Control Bureau (the New York County case). A May 1, 1975 report states that petitioner was cooperating and maintaining his contacts with the police department “regarding] large purchases of cocaine, organized crime figures involved in massage parlors and narcotics traffic.” Petitioner, in his capacity as a confidential informant, was instrumental in the arrest of a cocaine dealer in December 1975 and testified at the dealer’s trial in 1976.
In November 1975, petitioner was charged with grand larceny, criminal possession of stolen property in the first degree, and lesser charges. The indictment stemmed from his assisting his employer, on whom he claimed to be informing, by driving a truck to a location in Queens to unload hijacked merchandise. Petitioner maintained that he was unaware that the truck was stolen and that he thought he was, as he had in the past, helping his employer move merchandise for his furniture business.
On December 12, 1975, petitioner, still in his 20s, and his almost 60-year-old employer were arrested for burglarizing the Queens residence of a 69-year-old woman, whom his employer had targeted. During the course of the burglary, the woman was bound and gagged, which resulted in her death by asphyxiation. This led to petitioner’s indictment for burglary and murder in the second degree (felony murder), which was consolidated with the indictment relating to the hijacked truck (the Queens County cases).
In May 1977, petitioner pleaded guilty to two counts of criminal sale of a controlled substance in the second degree in the New York County case and was sentenced to concurrent terms of SVs to life. After evaluating petitioner’s role in the 1975 burglary, the prosecutor allowed petitioner to plead guilty to burglary in the first degree in the Queens County cases and he was *84 sentenced to an indeterminate term, with a maximum of 20 years, to run concurrently with the sentence imposed in the New York County case.*
During his incarceration, petitioner earned a Bachelor of Science degree from New York State University/Regents College. Following his parole in December 1980, he worked at the Freewill Senior Citizen’s Center until August 1982, when he left to attend Cardozo Law School. That year, petitioner married. He has three step daughters, one of whom he has legally adopted.
While in law school, petitioner completed a number of legal internships. He graduated in June 1985 and sat for the July 1985 bar exam. In December 1985, petitioner was notified that he had passed the exam and had been certified to the First Department.
In December 1985, petitioner submitted his first application for admission. On February 20, 1986, he received a final discharge from the parole board. On March 20, 1986, he was issued a certificate of good conduct from the Board of Parole “to remove all legal bars and disabilities to employment, license and privilege, except those imposed by Sections 265.01 (4) and 400 of the Penal Law [neither of which is related to the practice of law] and except the right to hold Public Office.”
In December 1986, a subcommittee held a hearing on the adequacy of petitioner’s disclosure of his criminal history. In its report dated April 27, 1987, the subcommittee found:
“[b]ased upon the findings indicated by the various files and documents relating to [petitioner] examined by the Sub-Committee, it is our conclusion that [petitioner’s] responses to Questions ‘17’ and ‘18’ (as amplified by the Supplementary Material submitted by him following his initial application) are incomplete, inaccurate and misleading, not only with respect to the number of arrests, the details of the various indictments against him, and the sentences imposed, but the circumstances surrounding each event. Moreover, our investigation reveals nothing to support his statement (made in response *85 to Question ‘17’ of his December 1985 application) that the ‘circumstances of [the December 1975] arrest were mitigating.’ On the contrary, all of the records indicate that the arrest was to due to his serious involvement in the commission of a heinous crime, for his own gain, totally unrelated to his services as an informant for the Police Department.”
The decision as to whether petitioner’s rehabilitation, in all other respects, sufficiently merited his admission to the bar was referred to the Committee, which referred his application to a second subcommittee for a broader hearing as to whether he had been forthcoming regarding his criminal background and whether he possessed the requisite character and fitness to practice law.
In September 1989, petitioner withdrew his application. In June 1990, petitioner moved for leave to renew and to transfer his application to the Second Department. On March 1, 1991, this Court granted the renewal application but denied the request for a transfer. Thereafter, and continuing until August 1993, petitioner submitted additional documentation pursuant to the Committee’s requests for updates and clarifications.
In November 1993, a subcommittee issued its report in which it recommended that petitioner be denied admission on the ground that he had failed to demonstrate the requisite character and fitness. The subcommittee specifically noted petitioner’s lack of candor in his application, particularly with respect to his involvement in the December 1975 burglary, explaining:
“[i]t is the Sub-Committee’s opinion that no useful purpose will be served by holding any further hearings or calling any additional witnesses. It is our conclusion that despite [petitioner’s] apparent rehabilitation in many respects, throughout these proceedings he has deliberately made false and/or misleading affidavits and other statements under oath concerning his own conduct or the conduct of others which to his personal knowledge were untrue. After reviewing the record, including his testimony and supplemental affidavits submitted on his Renewed Application, it does not appear to us that he has yet overcome his compulsion to deviate from the truth, and even to fabricate, in his efforts to mislead this Committee in representations made by him in affidavits and sworn testimony; nor has he *86 overcome a pronounced tendency to excuse himself from fault by attempting to cast blame on others for his own misdeeds. Accordingly we conclude that [petitioner] has failed to demonstrate the character and fitness required to recommend him for admission to the Bar.”
In January 1994, the Committee adopted the subcommittee’s report and denied petitioner’s second application. This Court denied petitioner’s motion for an extension to petition for admission notwithstanding the Committee’s decision. Petitioner then continued his rehabilitation, waiting 14 years before he moved to renew his previously denied application for admission.
On August 27, 2009, this Court granted petitioner’s motion to the extent of referring the application to the Committee for “investigation, hearing and recommendation.” On May 19 and June 7, 2011, a hearing on petitioner’s third application was held before a new subcommittee. Petitioner testified on his own behalf and called two character witnesses. The first was a former New York State Supreme Court Justice. The second, an attorney admitted to practice for 34 years, was a past president of the Brooklyn Bar Association and New York City Trial Lawyers Association, a former Chair of the Second Department’s Grievance Committee, and former member of the Second Department’s Committee on Character and Fitness.
Petitioner testified that he has spent the last 30 years addressing the conduct that led to his crimes, during which time he continued his education and sought out positive influences. Upon his parole, petitioner worked as the Director of the Freewill Senior Citizen’s Center in Brooklyn where he aided seniors with social security questions, home attendants, and other issues related to the elderly. While in law school, petitioner interned with the Legal Aid Society’s Office of the Aging, performing legal research on issues involving the elderly. He also worked as a paralegal for an attorney doing research and writing on medical malpractice issues; as a legal intern with JC Penney’s legal department drafting memoranda on corporate law issues; as an intern with Cardozo’s Criminal Law Clinic; and as a student clerk for a now deceased Supreme Court Justice in New York County.
After law school, petitioner worked as a paralegal for a series of law firms. From 1993 until 2001, he worked as a paralegal for a former chair of the Brooklyn Bar Association, whose practice focused on elder law matters involving, inter alla, *87 Mental Hygiene Law article 81 and Surrogate Court proceedings. After this employer’s death, petitioner became a self-employed paralegal doing per diem motion work for attorneys. In this capacity, petitioner is given a case file from an attorney, conducts the necessary legal research through his own Westlaw account, and drafts a motion, which he gives to the attorney of record for review and signature.
Petitioner attested that he chose elder law before, during, and after law school in an effort to atone for his role in the 1975 death of the 69-year-old Queens woman. He explained, “I assisted someone in going into a house and tieing [sic] up an elderly person who later died. I spent — I’ve spent 30 years trying to make up for that.”
The former Supreme Court Justice testified that he came to know petitioner in 1992 as a result of his involvement with the Judicial Commission on Minorities, which had been formed due to concern over the high dropout rates among black males. He viewed petitioner as a perfect role model for dropouts since, after serving his prison sentence, he had become a productive member of society. The witness explained that “we don’t have many stories like this story where we can go out and say, ‘[l]isten, it really happened. Here’s a guy who got into trouble, went back to law school, turned his life around and now, look, he’s a lawyer.’ ” However, petitioner was ultimately unable to serve as an official role model because of his inability to gain admission to the Bar. The witness also testified that even though petitioner has been denied admission over a 20-year period, he has impressed him with the manner in which he performed as a paralegal; that petitioner has not projected an attitude of self pity, nor complained about his circumstances; and that petitioner has an excellent reputation for truth, honesty, and candor.
The former chair of the Second Department’s Grievance Committee testified that he met petitioner through one of petitioner’s employers and had known him for 13 years. He was impressed that petitioner became involved in paralegal work after his incarceration and that he attended law school knowing the challenges that he would face. The witness was aware that petitioner had previously been denied admission due to his lack of candor in connection with his application. However, the witness testified that petitioner was very remorseful about his criminal past and, in the witness’s opinion, had an excellent reputation for honesty and competence.
On August 23, 2011, the subcommittee issued its report in which it unanimously recommended petitioner’s admission. *88 Observing that petitioner had acknowledged his past mistakes, including his lack of candor in the admissions process and his participation in the 1975 burglary, and that he was now contrite and remorseful and had attempted to atone, the subcommittee explained:
“We have seriously considered the nature of [petitioner’s] criminal convictions and the lack of candor that [petitioner] previously evinced before the Committee. While [petitioner’s] prior actions reflect negatively on his qualifications for admission, there are mitigating factors that are evident from his submission. [Petitioner] acknowledges that he lacked candor in his previous application and is remorseful of his prior actions, including his participation in the 1975 burglary. [Petitioner’s] criminal involvements occurred in the 70’s, over 40 years ago when he was a young man. He also candidly admits his lack of candor in his prior request for admission to the Bar. He has a long uninterrupted work history since his release from prison. Notably, he enjoys a reputation for truthfulness and candor in the community and he has gained the respect of the community through his hard work. Significantly, it is apparent that [petitioner] who is now 64 years old, has already suffered substantially for his mistakes and has positively rehabilitated himself. He has paid his debt to society by serving his time in prison and overcoming his former criminal behavior. He is a productive and responsible member of society as testified to by his character witnesses. In sum, he currently possesses the character and fitness required to be a member of the New York State bar.”
In narrowly disapproving the subcommittee’s recommendation and denying petitioner admission, the Committee, in its report dated November 22, 2011, stated:
“1. We are not persuaded by the Subcommittee Report and [petitioner’s] testimony in the transcript of the hearing dated May 19, 2011, that [petitioner] is currently possessed of the proper and required traits of character and fitness that qualify him for admission to the New York State Bar and find his testimony not credible.
“2. There remain questions and issues of fact involv *89 ing inconsistencies and mis-statements included in the transcript of the hearing dated May 19, 2011, which call into question the truthfulness, accuracy and contrition of [petitioner] with respect to the reporting of past criminal events in which he was involved; and subsequently, his straightforward reporting of the same in both his Law School Application and his Application for Admission to the New York State Bar.”
Judiciary Law § 90 (1) (a) directs, in relevant part, that upon certification that a person has passed the bar examination, the Appellate Division, upon being satisfied that “such person possesses the character and general fitness requisite for an attorney and counsellor-at-law . . . shall admit him to practice as such attorney and counsellor-at-law.” A felony conviction does not, in and of itself, disqualify an applicant on character grounds (see Matter of Newhall, 143 AD2d 293 [3d Dept 1988] [admitting applicant who was convicted of assault in the second degree approximately nine years earlier]).
Consequently, “rather than taking the view that prior serious misconduct invariably requires disqualification, courts tend to consider the facts of each case in light of the totality of circumstances surrounding an application for bar admission” (In re Manville, 494 A2d 1289, 1295 [DC 1985]). We assess whether the record demonstrates that the applicant’s “past problems are no longer manifest,” whether the applicant has reformed and rehabilitated his or her life to the extent that “recurrence is unlikely,” and whether the applicant no longer “possesses behavioral traits that may constitute a threat to individual clients or society in general and undermine the integrity of the legal system” (Matter of Wiesner, 94 AD3d at 172, 170). In performing this analysis,
“we may be guided by the standards promulgated by the American Bar Association, which involve a number of related inquiries: the applicant’s age when the crime was committed, whether the crime was recent, whether the information about the crime is reliable, the seriousness of the conduct, underlying factors, the cumulative consequences of the crime, evidence of the applicant’s rehabilitation, whether the applicant has since made a contribution to society, the applicant’s honesty during the application process and, in that regard, whether the *90 applicant omitted material information or made material misrepresentations (Comprehensive Guide to Bar Admissions Requirements, ABA Section of Legal Education and Admissions to the Bar and National Conference of Bar Examiners at vii-viii [1994-1995]).” (Wiesner at 170-171.)
Viewed in the light of these principles, petitioner, as the subcommittee providently recommended, should be admitted to practice. Although petitioner engaged in very serious misconduct, that conduct occurred approximately 40 years ago when petitioner was in his 20s, and, with respect to the 1975 burglary conviction, under the influence of his almost 60-year-old employer, who had been arrested on two prior occasions that year for criminal possession of stolen property. Petitioner, now 66, has acknowledged that he was responsible for his past crimes and has, in the 32 plus years since his release from prison, undertaken a useful and constructive place in society. This includes raising a family, maintaining continuous and satisfactory employment as a paralegal, and devoting substantial time to the area of elder law in an effort to atone for the unintended death of the senior citizen during the 1975 burglary. Petitioner’s character witnesses, who were made aware of his criminal history, his recovery and his present behavior, personally vouched for petitioner and attested to his present reputation for truth, honesty, and candor and his legal ability and good character.
Petitioner’s admission is fully supported by this Court’s recent decision in Matter of Wiesner. Unlike petitioner, who was at most a mid-level participant, Wiesner was the kingpin of an extensive criminal enterprise. From 1980 to 1982, Wiesner operated a large scale narcotics operation in which he used five sleep disorder clinics to direct clients to physicians, whom he paid up to $3,000 per day to write prescriptions for Quaaludes, then a schedule II controlled substance. The enterprise took in up to $20,000 per day at its peak, and Wiesner earned approximately $1 million in all. In December 1984, he was arrested, and in 1987 he pleaded guilty to conspiracy to violate federal narcotics laws and to distribution and possession of Quaaludes.
In 1985, Wiesner was convicted of attempted second-degree murder, first-degree burglary, first-degree unlawful imprisonment, second-degree criminal possession of a weapon, and first-degree criminal use of a firearm. The charges stemmed from an incident in which Wiesner cajoled his estranged girlfriend to *91 meet him at the Clifton train station by stating that they needed to exchange keys and other possessions. Once they met, he pointed a stolen handgun at her, threatened her, led her to a pier and forced her to go back to her apartment with him, where he held her against her will for over seven hours. Fearing for her life, Wiesner’s former girlfriend escaped by jumping from a second-story window. As she fled, Wiesner fired five or six shots in her direction. While, fortuitously, none of the shots hit her, she sustained fractures in both her heels, tore cartilage in her chest, and injured the platebone in her back.
In 1989, Wiesner’s petition for a writ of habeas corpus was granted on the ground that he was denied his right to represent himself at his attempted murder trial (see Wiesner v Abrams, 726 F Supp 912 [ED NY 1989], affd 909 F2d 1473 [2d Cir 1990]). When his former girlfriend, out of fear, would not cooperate with the District Attorney and return to New York to testify at the retrial, Wiesner was allowed to enter an Alford-Serrano plea (for which he did not have to allocate to the facts of his guilt) to attempted murder in the second degree in exchange for a sentence of 2 to 6 years, nunc pro tune from December 1984, to run concurrently with time served for his federal drug conviction.
After his release from prison, Wiesner obtained a college degree, a law degree, passed the bar, and was admitted to practice in numerous jurisdictions. In his initial applications for admission to the New York bar, he alleged that he did not understand that his former girlfriend felt threatened when he held her in an apartment for several hours at gunpoint. He also asserted that when he fired the gun, he only wanted to scare her so that she would not alert the police, who would prevent his intended suicide, and that he had been misled by advice of counsel in connection with his narcotics operation. Even at his last hearing, Wiesner continued to dispute his mens rea in connection with the shots he fired at his ex-girlfriend and never explained why, if he was not preventing her from leaving the apartment, she felt it necessary to jump from a second-story window rather than leave through the door. Of great significance, he also expressed exasperation, if not resentment, at being asked to demonstrate his remorse over the incident.
Despite Wiesner’s inability to acknowledge the extent of his culpability and adherence to explanations of his conduct that defied common sense, this Court found that while Wiesner’s crimes were very serious, they were not recent, and that his *92 conduct over the last 30 years and the references of his character witnesses, persons of achievement with significant professional credentials, established that he had rehabilitated himself to such an extent that he satisfied the character and fitness requirement set forth in Judiciary Law § 90.
Although each application for admission must be judged individually, the same legal standards must be applied in all cases. Here, as in Wiesner, the record, including testimony by a former Supreme Court Justice and by a former Chair of the Second Department’s Grievance Committee, clearly and convincingly establishes that petitioner’s attitude and behavior subsequent to his criminal acts demonstrate personal reform and rehabilitation and that the traits that led to his criminal conduct have been excised from his character.
In an attempt to divert the analysis from the recent past to the very distant past, the majority devotes substantial time to an in depth analysis of why petitioner’s first two applications were denied and finds that some of the traits bearing on petitioner’s character with respect to the original applications still manifest themselves, “even if they seem less pronounced.” The majority posits that petitioner takes responsibility in a “formal sense, but he clings to some explanations concerning the crimes he committed that continue to seem implausible.” However, the twists and turns in the majority’s writing are merely strained attempts to come up with some meaningful reasons to deny petitioner admission other that the fact that a woman died after she was gagged during the burglary, and are belied by the record relating to the application at issue, which demonstrates petitioner’s acceptance of responsibility for his past crimes and for his lack of candor in his prior applications for admission.
In the petition before us, petitioner unequivocally states, among other things, that
“I accept personal responsibility for my criminal conduct. My conduct was egregious and I am totally blameworthy for these acts and misdeeds. My prior application for admission to bar, upon reflection was not totally forthcoming. I wholeheartedly regret and apologize to the committee for not accepting responsibility for my actions.
“I accept the finding of the subcommittee dated . . . November 15th, 1993, which was forwarded on *93 January 5th 1994, [and] concluded that my character and fitness were not such that I should be considered eligible for the bar.”
As to his drug offenses, petitioner acknowledges that he obtained four ounces of cocaine for a person with whom he became friendly and that “[he] made the conscious decision to locate the drugs for him and on September 30, 1974, [he] delivered the drug to a pre arranged location.” Petitioner also admits that he sold the same people four ounces of cocaine on October 4, 1974, delivered a sample to them on January 2, 1975, and was arrested on March 4, 1975 while delivering another eight ounces.
As to the hijacking, petitioner admits that on November 12, 1975, his employer asked him to drive his truck to Queens, where he was told to unload another truck that had broken down. As he was loading the truck, he was arrested.
As to the burglary charges, petitioner admits that he and another individual broke into a home where “we bound and gagged [an] elderly woman” and stole various articles, and that he was charged with felony murder and allowed to plead guilty to burglary after he admitted his involvement.
At the hearing before the subcommittee, petitioner addressed his lack of candor in his prior applications, stating that on his first application “I was not ready. 1 hadn’t — I hadn’t forgiven myself for what I had done. Since that first application, its been a steady process of self-reflection.” Petitioner stated that he had now “come to the realization that I can sit before you and say yes, I did those things and yes, they were totally egregious and I don’t know who that person was. It was me, but I don’t know who that person was and I’m not that person now.” Expanding on this point, petitioner explained:
“The difference between myself now and then, is that I’m able to look at everything and categorically, without sugarcoating my presentation say to you that what I did then, and I am totally guilty of it, there is no explanation for it, there is no — I’m not trying to put blame on anyone else, other than myself, what I’ve done since then, is my own total examination of who I am as a person.”
Petitioner stated that prior to this self-realization he had to justify what occurred in order to live with himself and that he “sought justification by blaming others, as opposed to saying to *94 myself, those are your acts, those are your decisions to do what you did. Even if — even if someone presented an opportunity, the final decision was still yours.” He explained:
“[A]t that point I wasn’t ready to say that. I wasn’t ready to accept responsibility. There was, in my head, a non-belief that that all happened to me. I didn’t believe it. It was there in black and white obviously. I was in prison for five years. But in my head, I was still not ready to accept that that was me and I tried to justify the behavior.”
When asked, “[s]o do you now admit that you knowingly and intentionally participated in the burglary that resulted in the death of that lady?”, petitioner responded unequivocally: “Yes, I do.” While petitioner adhered to his prior claim that after the burglary he returned to the apartment and removed the elderly woman’s gag, he emphasized that “I don’t want this to seem that I’m trying to lessen my own participation, that’s not what I’m trying to do.”
As to the drug charges, in the prior hearings petitioner made it appear that he was doing a favor for a friend in small drug deal and got caught. Petitioner now admitted that he sold “a substantial amount of drugs” on multiple occasions, that “I did those things. It was my decision to participate.” He also admitted that he was responsible for the crimes and that there was no one else to blame for his actions.
The majority attempts to paint petitioner as a major drug dealer and experienced hijacker. However, each of petitioner’s drug transactions involved the sale of approximately four to eight ounces, not kilos, and the majority attributes far too much significance to the police department’s acceptance of petitioner as a confidential informant, which hardly establishes that he was an expert in hijacking.
Petitioner’s candor was also attested to by his character witness, a former Chair of the Second Department’s Grievance Committee. When asked if he had any insight on the critical question of whether petitioner had truly reformed or was just saying what is expedient, the witness explained:
“One thing certainly that struck me was that he seemed to be very contrite about the situation, very remorseful about what happened to lead him to the problems that he had. And he never struck me as a person who lacked candor.
*95 “And I guess the only other thing I could add to that is to say that between 1985 and 2011 is a long period of time. And I know, just from reviewing his application and talking to him a couple of times in contemplation of coming here today, that he is most remorseful about it. And I have never had an issue with him in my dealings with him about his lack of candor. . . .
“You know, I spent the whole time being in a place like Court Street, downtown Brooklyn. And one thing about us all is that, you know, we may be a relatively large group, but it’s kind of a homogenous group. Everybody knows everybody, pretty much. And I would daresay that probably the best relationships I’ve had with lawyers are with people who I didn’t have to worry about reducing it to writing, I could put my hand in their hand and go to the bank on it.
“So, I mean, to try to answer your question, ... I mean, people like me, I think, know about people’s reputation in our little community. And he has a wonderful reputation or I wouldn’t be sitting here and I wouldn’t have committed to doing this over 10 years ago. Because I did, like I said before, I told him that I would be happy to come here and to talk about him because I know of his reputation for honesty and I know of his reputation for competence as well.”
The subcommittee found the testimony of petitioner and his character witnesses persuasive and concluded that petitioner “currently possesses the character and fitness required to be a member of the New York State bar.” In discounting this testimony and finding that petitioner did not possess the proper and required traits of character and fitness that would qualify him for admission to the New York State bar, and that issues of fact remain as to petitioner’s candor with respect to the reporting of the past criminal events in which he was involved, the Committee improvidently substituted its own credibility determinations for that of the subcommittee. Unlike the Committee, the subcommittee held a hearing at which it had an ample opportunity to observe the demeanor, evaluate the testimony and assess the credibility of each witness who testified, including petitioner, and rationally found that petitioner *96 was candid and sincere and had accepted responsibility for his crimes.
The majority compounds this mistake when it finds that petitioner’s purported lack of candor concerning his past crimes outweighs the overwhelming evidence of his rehabilitation. As detailed above, petitioner explained at the hearing that he had not been ready to accept responsibility for his behavior in the past, and “sought justification by blaming others, as opposed to saying to [him]self, those are your acts, those are your decisions to do what you did.” He then acknowledged that he intentionally participated in the 1975 burglary that resulted in the death of the Queens woman, that between 1974 and 1975 he intentionally participated in the sale of a substantial amount of illegal narcotics, and that he participated in the hijacking and did not want the subcommittee “to think that [he was] trying to lessen [his] own involvement.” This testimony convincingly establishes that petitioner has now accepted personal responsibility for his past criminal conduct.
The majority’s efforts to diminish the weight to be given to the testimony of petitioner’s character witnesses is puzzling. While the majority asserts that the former Supreme Court Justice was not familiar with the details of petitioner’s crime, this alleged deficiency existed in Wiesner, where many of the character witnesses lacked a full understanding of the nature and severity of Wiesner’s crimes or blindly accepted Wiesner’s incredible version of events.
Of note, the Wiesner majority observed that “[w]hile Dean Feerick was unfamiliar with the nature of petitioner’s offenses . . . upon being so informed, [he] expounded on the importance of redemption in adhering to his recommendation that petitioner’s application be approved” (Wiesner at 176). Here, a former New York State Supreme Court Justice, after being told of the death of the woman during the burglary, similarly expressed his view that “punishments — all punishments — must some day come to an end.” When a subcommittee member advised the former Justice that petitioner took full responsibility for his actions in his current application and had explained why he was unable to do so in his earlier ones, the witness opined that petitioner’s prior lack of candor was understandable and that he is now forthcoming, he should be admitted.
The majority also fails to give any weight to the fact that one of petitioner’s character witnesses was a former Chair of the Second Department’s Grievance Committee, and former *97 member of the Second Department’s Committee on Character and Fitness. In contrast, in Wiesner, this Court noted that one of Wiesner’s character witnesses “remarked that his own career had included a stint as an attorney for the Grievance Committee, making him especially sensitive to the embarrassing possibility that a recommended attorney might act dishonorably” (Wiesner at 177).
The majority places great weight on the fact that petitioner continues to adhere to his claim that he removed the gag from the woman during the 1975 burglary. However, a similar issue arose in Wiesner, where Wiesner incredibly maintained that he did not intend to hit his girlfriend when he repeatedly fired the gun out of a window through which she had just fled in fear for her life, after Wiesner kidnapped and held her at gunpoint for several hours. This Court essentially found that any unresolved issue as to Wiesner’s actual intent and his unwillingness to retreat from a continuing defensive posture in accounting for aspects of his criminal history did not outweigh the substantial evidence of rehabilitation.
Significantly, the majority in Wiesner recognized that the dissent’s “conclusion that petitioner has started the journey towards rehabilitation but is ‘not there yet,’ begs the question: how is [Wiesner] to get ‘there’ ” (Wiesner at 184). Stating that “[w]e really cannot know” whether Wiesner was confused due to his drug intoxication at the time, or whether he “sincerely believes that the way he remembers the event is the truth,” or whether it was in fact the truth, the majority criticized the dissent for taking the position that in order to be admitted Wiesner “must testify that he intended to kill his former girlfriend and shot at her, fortuitously missing, in furtherance of that intent” (Wiesner at 184).
Here too, the question remains that if petitioner, age 66, is not admitted now, then when. Although petitioner’s testimony that he removed the gag during the 1975 burglary may be questioned, the subcommittee did not find the testimony to be a fabrication. Petitioner may sincerely believe that he did remove the gag. Yet the majority is in effect adopting the position that this Court criticized in Wiesner, holding that petitioner must testify that he never went back to remove the gag if he is ever to be admitted to the New York bar. This is not just. Our analysis of petitioner should be in accord with this Court’s recent precedent for substantially analogous applicants and petitioner is entitled to the same treatment as Wiesner. Even if petitioner *98 may be deemed to have exhibited a defensive posture as to certain aspects of his crimes, he has acknowledged his responsibility for them, for which he spent five years in prison and over 30 years atoning. As the majority concedes, since his release on parole petitioner’s “personal history took a commendable term for the better,” and he has led a “seemingly unblemished personal life.” Petitioner has demonstrated a “commendable work ethic,” and there is “no basis to doubt the sincerity of [petitioners] regrets” over the elderly woman’s death or to “suspect that [petitioner] will re-offend.” Thus, contrary to the majority’s ultimate finding, we are dealing with far more than the mere passage of time and “the extraordinary results for rehabilitation that was found in Wiesner” undeniably exist here.
Nevertheless, the majority would distinguish Wiesner on the ground that he was not admitted until his tenth application, whereas this is only petitioner’s third. However, unlike Wiesner, who filed successive repetitious petitions and repeatedly sued unsuccessfully to challenge this Court’s denial of his applications for admission (see e.g. Wiesner v Rosenberger, 1998 WL 695927, 1998 US Dist LEXIS 15666 [SD NY 1998], affd 1999 US App LEXIS 29259 [2d Cir 1999]; Wiesner v Nardelli, 2007 WL 211083, 2007 US Dist LEXIS 5801 [SD NY 2007], affd 307 Fed Appx 484 [2d Cir 2008]), petitioner patiently continued his rehabilitation without complaint for 14 years before applying for readmission after his second application for admission had been denied, and he should not be penalized for his exercise of restraint and good judgment.
Although the majority creates a new standard for admission and finds that petitioner has yet to adequately make amends for his crimes, it is clear that the only difference between petitioner and Wiesner is that Wiesner’s victim survived the five or six shots he intentionally fired at her, whereas petitioner’s victim suffocated after she was gagged during the 1975 burglary. While petitioner’s victim, as the majority surmises, must have been terrified during the burglary, the victim in Wiesner was terrorized at gunpoint for seven hours, escaping only after she jumped out of a second story-window in fear of her life.
The significance of the fact that a 69-year-old woman died during the burglary cannot be understated, and imposes a heavy burden on petitioner. However, that death, while tragic, does not in and of itself warrant the denial of petitioner’s application. After the prosecutor assessed petitioner’s role in the crime, he was allowed to plead guilty to burglary, not murder, and it *99 has never been alleged that he or his codefendant intended to harm the woman when she was gagged (see In re Manville, 538 A2d 1128 [DC 1998 en banc] [admitting applicant who was convicted 15 years earlier of a homicide that he committed in the course of a burglary in which a victim died from an unusual reaction to the chloroform that Manville applied]; Matter of James G., 296 Md 310, 462 A2d 1198 [1983] [admitting an applicant who 16 years earlier committed conspiracy to commit forgery, forgery and uttering, murder, and assault]). Nor does petitioner’s drug conviction operate to disqualify him (see Wiesner at 170-171; Matter of Kesselman, 100 AD2d 606 [2d Dept 1984] [advance ruling that the applicant’s prior conviction of criminal sale of a controlled substance in the third degree would not operate to disqualify him on character grounds]; Matter of Sobin, 649 A2d 589, 589 [DC 1994] [admitting applicant “despite (his) felony convictions for conspiracy to manufacture a controlled substance and aiding and abetting both interstate prostitution and interstate transportation in aid of interstate racketeering” approximately seven years earlier]).
Contrary to the majority’s view, I do not cite Wiesner to compel a particular result in the present, different case. Again, my position is that the legal standards with reference to an application for admission that this Court employed in Wiesner must be applied equally to petitioner. Thus, the import of the references to the facts in Wiesner is to demonstrate that the majority’s attempts to show that petitioner does not satisfy those legal standards is disingenuous, and boils down to their belief that petitioner should not be admitted because the victim of the 1975 burglary died, whether intentionally or not. However, a per se rule of exclusion, even when the applicant’s past offenses are grave ones, conflicts with the principle that “the test is whether the applicant currently possesses the character and fitness to practice law” (Wiesner at 172), as well as “[t]he concept that human redemption is possible and valuable — a belief that is both well established in law and premised upon long-standing, even ancient traditions” (In re Dortch, 860 A2d 346, 356 [DC 2004] [internal quotation marks omitted]). As the former Justice who testified on petitioner’s behalf eloquently stated, “punishments — all punishments — must some day come to an end.” Here, petitioner has lived an exemplary life for more than 30 years since his release from prison and has shown that he is fully rehabilitated and currently possesses the requisite character and fitness for admission to the bar. Nothing *100 further can be accomplished, other than as an inappropriate punitive measure, by denying his application for admission, which poses no threat to the public.
Accordingly, we should issue an order granting petitioner’s application for admission to practice as an attorney and counselor-at-law in the State of New York notwithstanding the Committee’s decision.
Friedman and Sweeny, JJ., concur with Tom, J.E; Andrias and Freedman, JJ., dissent in an opinion by Andrias, J.
Petition denied.

 In connection with the Queens burglary, petitioner’s codefendant was found guilty after trial of second degree murder. The Court of Appeals reversed the conviction and the case was remanded for a new trial based on a Miranda violation. The codefendant, almost 70 years old, was then allowed to plead guilty to robbery in the first degree.